UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Angela Susan Barup**

v.

Civil No. 16-cv-62-PB
Opinion No. 2017 DNH 063

**US Social Security Administration,**
**Acting Commissioner, Nancy A. Berryhill**

**MEMORANDUM AND ORDER**

Angela Susan Barup is a forty-five-year-old woman who previously worked as a nurse's aide and home health aide, among other positions.  Barup challenges the Social Security Administration's denial of her claim for disability insurance benefits ("DIB").

## I.   BACKGROUND

In accordance with Local Rule 9.1, the parties have submitted a joint statement of stipulated facts (Doc. No. 14).  Because that joint statement is part of the court's record, I do not recount it here.  I discuss facts relevant to the disposition of this matter as necessary below.

## II.   STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), I have the authority to

review the administrative record and the pleadings submitted by
the parties, and to enter judgment affirming, modifying, or
reversing the final decision of the Commissioner.  That review
is limited, however, "to determining whether the [Administrative
Law Judge] used the proper legal standards and found facts
[based] upon the proper quantum of evidence." Ward v. Comm'r of
Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  I defer to the
Administrative Law Judge's (ALJ's) findings of fact, so long as
those findings are supported by substantial evidence.  Id.
Substantial evidence exists "if a reasonable mind, reviewing the
evidence in the record as a whole, could accept it as adequate
to support his conclusion." Irlanda Ortiz v. Sec'y of Health &
Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam)
(quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d
218, 222 (1st Cir. 1981)).

      If the substantial evidence standard is met, the ALJ's
factual findings are conclusive, even where the record "arguably
could support a different conclusion." Id. at 770.  Findings
are not conclusive, however, if the ALJ derived his findings by
"ignoring evidence, misapplying the law, or judging matters
entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st
Cir. 1999) (per curiam).  The ALJ is responsible for determining
issues of credibility and for drawing inferences from evidence
in the record. Irlanda Ortiz, 955 F.2d at 769.  It is the role

of the ALJ, not the court, to resolve conflicts in the evidence.
Id.


### III.   ANALYSIS

Barup applied for DIB in November 2011, alleging an onset
date of April 12, 2011, which she later amended to April 15,
2011. The ALJ initially denied her application in June 2013, but
the Appeals Council vacated the ALJ's decision and remanded the
case.  On remand, the ALJ held a second hearing in June 2015, at
which Barup, represented by counsel, and a vocational expert
testified.  In a written decision dated June 25, 2015, the ALJ
again denied Barup's application for DIB.

The ALJ applied the five-step sequential analysis outlined
in 20 C.F.R. § 404.1520(a) to Barup's claim.  At step one, the
ALJ determined that Barup had not engaged in substantial gainful
activity from the alleged onset date through the date of the
decision.  The ALJ then found a number of severe impairments at
step two: left pronator syndrome, left carpal tunnel syndrome,
acromioclavicular (AC) joint disease, biceps tendon disease,
degenerative disc disease, and obesity.  He also considered a
number of other impairments, but found them non-severe: right
shoulder and wrist pain, headaches, fibromyalgia, and
depression.  In his step three analysis, the ALJ concluded that
none of Barup's impairments met or medically equaled a listed

impairment.  After formulating Barup's residual functional capacity ("RFC"), the ALJ proceeded to step four and determined that Barup could not perform any of her past relevant work.  At step five, the ALJ reached the conclusion that Barup was not disabled because she could still perform a significant number of jobs in the national economy.

The Appeals Council subsequently declined to review the ALJ's second decision in December 2015.  The ALJ's decision now constitutes the Acting Commissioner's final decision, meaning the matter is ripe for judicial review.

On appeal, Barup advances two main arguments for remand: (1) the ALJ erred in his treatment of opinion evidence when crafting her RFC, and (2) the ALJ failed to account for Barup's non-severe impairments after step two.  I address each argument in turn, ultimately finding both unpersuasive.

**A.** **Treatment of Opinion Evidence**

Barup argues that the RFC found by the ALJ lacks support because the ALJ erred in his treatment of the opinion evidence in the record.  A claimant's RFC is "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1).  On appeal, I determine whether the assigned RFC is free of legal error and supported by substantial evidence. See Nguyen, 172 F.3d at 35.  Here, the ALJ found that Barup

4

could engage in "light work"[1] subject to a number of limitations:

> she could stand or walk for two hours and sit for six
> hours in an eight-hour day; she must avoid all
> ladders, ropes, and scaffolds, but can occasionally
> climb ramps or stairs, balance, stoop, kneel, crouch,
> and crawl; she can occasionally reach overhead with
> the left upper extremity and can frequently but not
> constantly perform fine and gross manipulation with
> the non-dominant left hand; she should avoid all
> heights or hazards and concentrated exposure to
> extreme heat or cold temperatures and vibrations.

Tr. at 25.

The ALJ ultimately concluded that although "the claimant's
medically determinable impairments could reasonably be expected
to cause the alleged symptoms . . . the claimant's statements
concerning the intensity, persistence and limiting effect of
these symptoms are not entirely credible."  Tr. at 26.  The ALJ
reached this conclusion based on an extensive discussion of the
objective evidence in the record, followed by an examination of
the opinion evidence.

Based on his evaluation of the objective evidence in the
record, the ALJ determined that Barup's severe impairments
lacked sufficient "treatment history, objective medical
evidence, and clinical findings to support a finding of

---

[1] "Light work involves lifting no more than 20 pounds at a time
with frequent lifting or carrying of objects weighing up to 10
pounds.  Even though the weight lifted may be very little, a job
is in this category when it requires a good deal of walking or
standing, or when it involves sitting most of the time with some
pushing and pulling of arm or leg controls."  20 C.F.R. §
404.1567(b)

disability."  Tr. at 26.  The ALJ devoted significant space to a
summary of Barup's treatment history for her severe impairments.
See Tr. at 26.  After complaining of back pain, Barup had an MRI
of the lumbar spine in January 2010, showing disc bulges and
mild degeneration.  See Tr. at 26.  Treatment provided Barup
some relief, but she complained again in March 2011 of radiating
back pain.  Tr. at 26.  On examination, Barup described
tenderness and pain during some movements, but also showed
strength in the extremities and other signs of mild impairment.
See Tr. at 26–27.

In April 2011, Barup injured her left shoulder in a work-
related incident.  She underwent an EMG test in May 2011 after
describing pain in her upper left extremity and was diagnosed
with mild to moderate left pronator syndrome.  Tr. at 27.  She
continued to complain of pain in the lower back and upper left
extremity through 2011, receiving treatment at both locations.
See Tr. at 27.

Barup's reported lower back and upper extremity pain
continued into 2012.  A February 2012 MRI of her left shoulder
showed an "extensive partial tear of the supraspinatus tendon,"
"moderate to marked arthrosis of the left AC join with inferior
osteophyte formation," and "thickening of the middle
glenohumeral ligament."  Tr. at 27.  Following the MRI and
unsuccessful physical therapy, Barup had left shoulder surgery

6

in April 2012.  As of December 2012, however, she continued to
have pain and numbness in her left arm and exhibited tenderness
and decreased range of motion in the left shoulder.  Tr. at 27.
Further, a September 2012 MRI of the cervical spine showed
degeneration and encroachment, but no spinal stenosis or
significant foraminal narrowing.  Tr. at 27.

In January 2013, Barup treated with Dr. Philip Savia.  See
Tr. at 28.  After another MRI of the left shoulder in February —
which suggested tendinopathy, a partial tear, or complications
from prior surgery — Barup continued to exhibit pain in the
upper left extremity and decreased range of motion during two
March 2013 examinations.  Tr. at 28.

At a March 2013 treatment with Dr. Praveen Suchdev, Barup
received an injection in her left shoulder.  At a follow-up May
2013 treatment, Barup "reported a 70 percent improvement in the
left shoulder following the procedure."  See Tr. at 28.  Dr.
Suchdev diagnosed Barup with cervical radiculitis, myofascial
pain syndrome, AC joint dysfunction, and shoulder arthralgia.
Tr. at 28.

Barup also treated with Dr. Jon Warner in May 2013.  On
examination, Barup showed left shoulder tenderness, but also
strength and supportably mild limitation in range of motion.
See Tr. at 28.  X-rays obtained during the visit "showed some
mild AC joint degenerative changes as well as mild glenohumeral

joint degenerative changes." Tr. at 28.  At a June 2013 follow-up, Dr. Warner noted that his examination supported diagnoses of biceps tendon disease, impingement, and AC joint disease.  Tr. at 28.  He did not recommend further AC injections or note any functional limitations, though he did suggest additional surgery if Barup's pain persisted.  Tr. at 28.

After discussing Barup's treatment history, the ALJ next outlined the limitations that Barup and her husband had testified to at the first hearing.  Barup alleged a need to change positions to avoid back pain, occasional use of a walker, and dizziness and inability to concentrate caused by her medications.  Tr. at 29.  She also noted difficulty dressing caused by her left hand impairment.  Tr. at 29.  Barup's husband, Christopher Blackler, reiterated some of Barup's limitations, including her difficulties dressing and walking. Tr. at 29.  He added that she had trouble tying her shoes, had issues with her memory, and suffered from headaches.  Tr. at 29.

The ALJ reasoned that the record as a whole failed to support Barup's alleged limitations, because "the claimant's symptoms may not be accurately reported, may not exist at the level of severity assumed . . . and may have other mitigating factors against their negative impact on claimant's [functional] ability."  Tr. at 29.  The ALJ pointed to specific evidence in the record to support his conclusion, including an October 2011

examination for back pain during which Barup "was able to stand and ambulate without difficulty, and her gait was normal"; the January 2013 opinion of Dr. Savia that her shoulder injury typically would not cause the paresthesia complained of; and the strength and range of motion in the shoulder demonstrated at Dr. Warner's May 2013 examination.  Tr. 29–30.  The ALJ added that although Barup used a walker at the first hearing in June 2013, she did not use one at a January 2013 occupational evaluation. Tr. at 30.

The ALJ closed his discussion of the objective evidence by explaining — with a number of citations to the record — that Barup's clinical presentation had been mild since the initial denial of benefits and the record did not suggest increased functional limitations arising in the interim.  See Tr. at 30–31.

Having analyzed the objective evidence, the ALJ proceeded to weigh the opinion evidence.  The ALJ placed great weight on the January 2012 opinion of state reviewing physician Hugh Fairley, M.D., because Dr. Fairley's opinion was consistent with the objective evidence in the record.  See Tr. at 32.  In pertinent part, Dr. Fairley opined that Barup could work at a sedentary exertional level, but only engage in limited pushing and pulling with the left upper extremity and occasional overhead reaching with the left upper extremity.  See Tr. at

114-15.  The ALJ rejected Dr. Fairley's sedentary limitation,
citing more recent evidence in the record and a January 2013
opinion by occupational therapist Ryan Gatchell.  Tr. at 32.

The ALJ next placed little weight on the January 2013
opinion of examining physician Karen Huyck, M.D.  Tr. at 32.
Dr. Huyck indicated that functional capacity testing was to be
arranged, but opined that Barup could not return to work.  Tr.
at 857.  The ALJ explained that he gave the opinion little
weight because it was conclusory, provided little explanation,
and conflicted with the objective evidence in the record.  Tr.
at 32.

The ALJ also afforded little weight to the March 2013
opinion of treating physician Savia.  Dr. Savia, apparently
guided by OT Gatchell's 2013 RFC evaluation, found that Barup
could grasp, turn, and twist objects with both hands constantly;
engage in fine manipulation for one-half of a workday; and reach
her arms forward and overhead about three-fourths of a workday
for each motion.  See Tr. at 906-07.  Dr. Savia also suggested
that Barup would have difficulty staying on task, given her
claims of pain, and would miss four or more days of work per
month.  Tr. at 907.  Emotional factors contributed to Barup's
condition, and psychological factors may have played a role.
See Tr. at 906.  Dr. Savia cautioned that he was addressing some
issues outside of his practice area, neurology, and that Barup's

shoulder and arm pain were orthopedic issues, not clearly neurological.  Tr. at 907.  From a neurological standpoint, Dr. Savia concluded that Barup could function in the workplace.  Tr. at 907.  The ALJ gave a number of reasons for discounting Dr. Savia's opinion, none of which Barup challenges.

Barup does challenge, however, the "less than great weight" the ALJ assigned to OT Gatchell's opinions.  OT Gatchell examined Barup in January 2013 and September 2014, each time producing an evaluation of her functional capacity.  Accompanying the 2013 evaluation was a medical source statement interpreting the results of the evaluation.[2]  See Tr. at 875–80.  In the 2013 statement, OT Gatchell concluded in pertinent part that Barup could occasionally lift and carry up to twenty pounds; could never reach with the left hand, but could occasionally handle, finger, feel, push and pull with it; and could still sort or handle paper.  Tr. at 876–80.  The 2014 evaluation recognized similar limitations: Barup could perform work at the sedentary exertional level; frequently perform fine motor activities; and occasionally reach, though could never engage in repetitive motions with the left elbow or shoulder. Tr. at 1150.

---

[2] In the ALJ's initial 2013 decision, he assigned great weight to OT Gatchell's 2013 statement.

The ALJ gave several reasons for discounting OT Gatchell's opinions.  First, OT Gatchell was neither a treating source nor an acceptable medical source.  Tr. at 34.  With respect to the 2013 statement, the ALJ disagreed with OT Gatchell's determinations that Barup was limited in her ability to reach and could use her left hand only occasionally.  Tr. at 33.  Instead, the ALJ found that Barup had maintained good range of motion and grip strength in her hands, and that her activities of knitting and using a keyboard suggested minimal limitations.  See Tr. at 33–34.  Further, if the limitation to occasional use was actually justified, Barup "would display more findings on examination and display atrophy of the extremity from lack of use."  See Tr. at 34.  The ALJ also noted in the alternative that including the occasional limitation would not affect his step five analysis.  Tr. at 34.  As for the 2014 evaluation, the ALJ reasoned that OT Gatchell's sedentary finding — based on a functional test that involved walking — conflicted with Barup's claim that she regularly takes 30-minute walks for exercise.  Tr. at 34.

OT Gatchell was not the only occupational therapist to opine on Barup's functional capacity.  Joan Van Saun examined her in November 2014 and prepared a written report.  OT Van Saun essentially determined that Barup could perform some jobs involving light or sedentary work, provided that she would use

her left hand for light tasks for only half of every thirty-
minute period; she would reach away from her body rarely;
frequent lifting was limited to five pounds between knee and
shoulder levels; and Barup alternated between sitting and
standing.  Tr. at 1097.  Further, OT Van Saun noted that
fluctuations in Barup's pain could unpredictably force her to
miss work.  Tr. at 1097.

OT Van Saun's opinion received "less than great weight"
from the ALJ.  The ALJ first noted that OT Van Saun was neither
a treating source nor an acceptable medical source.  Tr. at 34–
35.  Second, OT Van Saun's opinions were "based strongly" on
Barup's subjective reports, and OT Van Saun's recognition of a
fluctuating ability to work lacked objective corroboration and
amounted to speculation.  Tr. at 35.  Third, the limitations on
Barup's upper extremity likewise lacked objective corroboration
in the record.  See Tr. at 35.

After weighing OT Van Saun's opinion, the ALJ proceeded to
give little weight to the opinions of treating nurse Danielle
MacDonald.  In a December 2014 letter, Nurse MacDonald noted her
agreement with OT Van Saun's evaluation and stated that Barup's
pain levels could affect her work attendance.  Tr. at 1110.  In
a January 2015 fibromyalgia medical source statement, Nurse
MacDonald opined that Barup experienced daily mild-to-moderate
pain and would be unable to concentrate for twenty-five percent

or more of a work day.  Tr. at 1118.  Nurse MacDonald noted via
checkboxes that emotional factors played a role in Barup's
condition and she could only tolerate low stress work.  Tr. at
1118.  Moreover, she would likely miss more than four workdays a
month.  Tr. at 1119.

The ALJ cited several reasons for discounting Nurse
MacDonald's opinion.  He noted that she was not an acceptable
medical source, did not provide notes of traditional "tender
point" examinations, and her treatment notes did not otherwise
provide objective evidence to support the limitations she found.
Tr. at 35-36.  Furthermore, he determined that Nurse MacDonald's
opinions were conclusory or ambiguous and did not address
Barup's capacity on a function-by-function basis.  Tr. at 35.

Finally, the ALJ considered the January and February 2015
letters of Barup's sister-in-law Joyse Daugherty.  Ms. Daugherty
described Barup's general decline in health and specific
instances of limitation she observed while staying with Barup
and her husband for a short time.  Tr. at 428-29.  The ALJ
considered Ms. Daugherty's letters, but gave them limited weight
because Ms. Daugherty was not a medical source, she only
observed Barup for a brief time, and her opinions conflicted
with other evidence in the record.  Tr. at 36.

Barup presents several arguments for remand based on the
ALJ's treatment of the opinion evidence.  I consider each

argument, finding no reversible error.

 1.   Piecing Together an RFC

 Barup first argues that the ALJ erred by finding an RFC
that did not match any RFC found by a medical source.  Because
the ALJ disagreed with all sources in the record, she argues
that he impermissibly interpreted raw medical data.  See Doc.
No. 10-1 at 5.  Barup identifies a number of instances where the
ALJ failed to adopt a limitation found in the record.  She
argues that: (1) the ALJ's "light work" limitation conflicted
with the opinions of Dr. Fairley, OT Gatchell, OT Van Saun, and
Nurse MacDonald; (2) the ALJ did not incorporate the limitation
to occasional left hand pulling and pushing found in Dr.
Fairley's opinion; (3) the RFC did not reflect the limitation to
occasional handling, fingering, and feeling with the left hand
as found by OT Gatchell; (4) the RFC did not allow for Barup to
alternate sitting and standing, as OT Van Saun and Nurse
MacDonald found she would need to do; (5) the ALJ failed to
include a limitation on the right upper extremity, conflicting
with Dr. Savia's opinion; and (6) the RFC did not account for
Barup being off-task or frequently absent from work, as noted by
Dr. Savia, OT Van Saun, and Nurse MacDonald.  See Doc. No. 10-1
at 16–17.

 This argument fails.  Although an ALJ may not interpret raw
medical data, see Nguyen, 172 F.3d at 35, the ALJ is free to

15

draw on multiple opinions in the record when crafting an RFC.
Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144
(1st Cir. 1987) (recognizing that an ALJ may "piece together the
relevant medical facts from the findings and opinions of
multiple physicians").  In this instance, the ALJ gave great
weight to the opinion of Dr. Fairley, and the RFC bears
similarity to the limitations Dr. Fairley identified.  Moreover,
for each of the limitations Barup enumerated above, the ALJ's
failure to include the limitation is either supported by an
opinion in the record or amounts to mere harmless error.

### a.   Light Work Limitation

The RFC determination adopted by the ALJ provided that
Barup could engage in light work, subject to a number of
limitations.  Barup correctly alludes to the fact that no
opinion evidence cited by the ALJ allows for Barup to do light
work, at least not without significant restrictions not
contained the RFC.  The ALJ's error, however, is harmless.  The
ALJ found at step five that Barup could transition to the
position of document preparer, for which 250 jobs exist in New
Hampshire and 63,000 jobs exist in the national economy.  Tr. at
37.[3]  A document preparer position only requires a sedentary

---

[3] In the decision, the ALJ states that 250 jobs exist for this
position in Vermont, Tr. at 37, but the hearing testimony makes
clear that the ALJ meant New Hampshire, Tr. at 102.

16

exertional level.  Thus, even if the ALJ had found Barup to have
a sedentary exertion level, she could still perform a
significant number of jobs in the national economy.  See Dashnaw
v. Astrue, 2011 DNH 178, 16–17 (finding 30,000 jobs nationwide
to be significant); Vining v. Astrue, 720 F. Supp. 2d 126, 137
(D. Me. 2010) (collecting cases and finding approximately 10,000
to 11,000 jobs nationwide to be significant).  This error does
not require remand.

### b.   Limitations on the Left Hand

The ALJ did not include Dr. Fairley's restriction to
limited left hand pulling and pushing in the RFC, nor did he
include OT Gatchell's limitation to occasional handling,
fingering, and feeling with the left hand.  Neither aspect of
the RFC provides cause for remand.  Although the ALJ failed to
note a limitation on left hand pulling and pushing in his
decision, the hypothetical he posed to the VE incorporated a
limitation to "occasional push[ing] or pulling with the left
upper extremity."  Tr. at 100.  The ALJ likewise asked the VE
whether a limitation to occasional fine and gross manipulation
with the left hand would affect the VE's analysis.  Tr. at 103–
04.  The VE responded that it would not.  Tr. at 104.  Thus,
limitations identified to the VE adequately track the language
in Dr. Fairley's and OT Gatchell's opinions.  See Tr. at 114
(Dr. Fairley) (noting only that ability to push and pull was

"limited" in left upper extremity); Tr. at 877 (OT Gatchell)

(limiting Barup to occasional handling, fingering, and feeling).

Because the ALJ based his step five finding on the VE's

responses, I find no reversible error.

### c.   Remaining Limitations Identified

Barup again correctly notes that the ALJ did not

incorporate the limitation on continuous sitting found by OT Van

Saun and Nurse MacDonald or the right upper extremities

limitations described by Dr. Savia.  Barup does not acknowledge,

however, that those limitations are not found in Dr. Fairley's

opinion, see Tr. at 113-16, nor in OT Gatchell's 2013 statement,

see Tr. at 875-80.  The ALJ considered both of those opinions,

assigning great weight to Dr. Fairley's conclusions and less

than great weight to OT Gatchell's.  Barup therefore has not

identified an instance of interpreting raw medical data.

Instead, the ALJ simply gave different weight to different

opinions.

Along similar lines, there is conflict in the opinion

evidence with respect to how often Barup would be off task or

miss work.  Barup points to the opinions of Dr. Savia, OT Van

Saun, and Nurse MacDonald to support a diminished ability to

stay on task and report to work; however, neither Dr. Fairley or

OT Gatchell identify any such diminished ability.  See Tr. at

Tr. at 113-16, 875-80.  Moreover, the February 2012 opinion of

examining psychologist Edouard Carigan, Psy.D — cited by the ALJ
at step two but not when crafting the RFC, Tr. at 22-23 —
concluded that Barup had no psychological difficulties in
concentration, task completion, or maintaining a schedule.  Tr.
at 652-653.  Again, this is a matter of weighing the opinion
evidence.  I review that aspect of the ALJ's reasoning next.

   2.   Weight Given to Individual Opinions

   Barup challenges the weight given many of the opinions in
the record.  I consider each of her arguments in order.

      a.   **Dr. Fairley**

   The ALJ gave great weight to the opinion of Dr. Fairley,
who determined that Barup could work at a sedentary exertional
level, but could only engage in limited pushing and pulling with
the left upper extremity and occasional overhead reaching with
the left upper extremity.  See Tr. at 32, 114.  Barup argues
that Dr. Fairley's opinion was remote in time and based on an
incomplete record.  Barup contends that if Dr. Fairley had
reviewed the fully developed record, including evidence
concerning fibromyalgia,[4] he would have recognized greater upper

---

[4] Barup connects her fibromyalgia to additional upper extremity
limitations, but does not develop an argument as to how that
particular impairment affects the functioning of her upper
extremities.

extremity limitations in his RFC.[5]  See Doc. No. 10-1 at 6.

I find this argument unpersuasive.  An ALJ may not assign a reviewing source's opinion "any significant weight," if the source reviewed a "significantly incomplete record."  See Alcantara v. Astrue, 257 F. App'x 333, 334 (1st Cir. 2007) (per curiam) (unpublished); see also Padilla v. Barnhart, 186 F. App'x 19, 22 (1st Cir. 2006) (per curiam) (unpublished); Bell v. Astrue, 2012 DNH 010, 21.  This rule does not apply, however, "where the medical evidence postdating the reviewer's assessment does not establish any greater limitations or where the medical reports of claimant's treating providers are arguably consistent with, or at least not 'clearly inconsistent' with, the reviewer's assessment."  Ferland v. Astrue, 2011 DNH 169, 11 (citations omitted).

I find that the exception applies in this case.  To start, the other opinion evidence cited by the ALJ does not establish greater upper extremity limitations than Dr. Fairley's.  With respect to limitations for the right upper extremity, Dr. Savia's March 2013 opinion did indicate some limitation, whereas Dr. Fairley's did not.  But Dr. Fairley's assessment is

---

[5] Barup also suggests that, because the ALJ's RFC recognized greater impairment or limitation than Dr. Fairley's, Dr. Fairley's opinion does not support the ALJ's conclusions.  To the extent the ALJ erred in adding limitations beyond Dr. Fairley's, such error would be harmless with respect to Barup.

consistent with the January 2013 opinion of OT Gatchell, who
listed no limitation for the upper right extremity.  See Tr. at
877.  With respect to the left upper extremity, although OT
Gatchell and OT Van Saun recognize greater limitations than Dr.
Fairley does, Drs. Fairley and Savia describe similar
limitations.  Compare Tr. at 114–15 (Dr. Fairley) (occasional
overhead reaching, unlimited fine manipulation) with Tr. at 907
(Dr. Savia) (overhead reaching seventy-five percent of the time,
fine manipulation fifty percent of the time).  Moreover, as
discussed below, Barup does not identify material error in the
ALJ's treatment of opinions postdating Dr. Fairley's.  Cf.
Johnson v. Comm'n, Soc. Sec. Admin., 2015 DNH 051, 15–16
(finding ALJ committed no error in relying on reviewing source's
opinion where ALJ supportably discounted postdated opinions).

        I also note that the ALJ demonstrated adequate
consideration of the objective evidence postdating Dr. Fairley's
opinion, at least in relation to the challenged upper extremity
limitations.  He noted instances of limited function in the left
shoulder on examination, Tr. at 27–28, but also supportably
recognized instances of mild limitation, Tr. at 28, 31, 952,
1128.  He likewise recognized a 2015 treatment note in which
Barup reported full range of motion in both her wrists and hands
and had adequate grip strength on examination, see Tr. at 30,
1122–23, while also noting at step two that Barup had exhibited

21

some weakness in her right hand, Tr. at 21, 1272.  I do not find

reversible error.  Cf. Bell, 2012 DNH 010, 24-26 (where there

was uninterpreted raw medical data, ALJ erred by relying on some

treatment notes without considering and discounting conflicting

notes); Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327,

329 (1st Cir. 1990) (ALJ may make "common-sense judgments about

functional capacity based on medical findings, as long as the

[ALJ] does not overstep the bounds of a lay person's competence

and render a medical judgment")

     **b.  Dr. Huyck**

The ALJ gave little weight to Dr. Huyck's January 2013

opinion that Barup could not return to work.  The ALJ accurately

noted that Dr. Huyck provided no specific functional limitations

and acknowledged that there had been no functional capacity

testing.  See Tr. at 32.  The ALJ also explained that "the

opinion expressed is quite conclusory, providing very little

explanation of the evidence relied on in forming that opinion."

Tr. at 32.  It also conflicted with the record evidence.  Tr. at

32.  Barup argues that the ALJ failed to mention Dr. Huyck's

accompanying treatment notes, which describe the examination

performed and the evidence reviewed.  See Doc. No. 10-1 at 7-8.

The ALJ did not err in failing to mention the notes.  Dr.

Huyck's treatment notes do not enumerate functional limitations.

Tr. at 858-61.  Thus, they do not address one of the

shortcomings of Dr. Huyck's opinion that the ALJ identified.
Further, the treatment notes reiterate that no functional
testing had been done — another flaw identified by the ALJ — and
suggest that Dr. Huyck's opinion was conditioned on later
functional testing.  See Tr. at 861 ("Out of work pending
functional testing.").[6]

### c.  OT Gatchell

OT Gatchell examined Barup in January 2013 and September
2014.  He produced an evaluation of her functional capacity each
time, but also prepared a 2013 medical source statement based on
his first evaluation.  In his 2013 statement, OT Gatchell
concluded in relevant part that Barup could occasionally lift
and carry up to twenty pounds; could never reach with the left
hand, but could occasionally handle, finger, feel, push and pull
with it; and could still sort or handle paper.  Tr. at 875–80.
The 2014 evaluation recognized similar limitations.  See Tr. at
1150.  The ALJ assigned both the 2013 statement and 2014
evaluation "less than great weight."  Tr. at 33.  The ALJ
reasoned, inter alia, that OT Gatchell was neither an acceptable
medical source nor a treating source, and cited to a treatment

---

[6] After discussing Dr. Huyck's opinion, Barup summarizes Dr.
Savia's opinion and recites the ALJ's reasons for discounting
it.  See Doc. No. 10–1 at 8–9.  I cannot discern a developed
argument that the ALJ gave erroneous reasons.

note and activities of daily living that conflicted with OT

Gatchell's assessment.  See Tr. at 33–34.

Barup argues that the ALJ erred in discounting OT

Gatchell's opinions because he was not an acceptable medical

source, as that is not a valid consideration.[7]  See Doc. No. 10-1

at 11–12.  I disagree.  Whether a medical source is acceptable

or not is a valid consideration when weighing an opinion.  See

SSR 06-03P, 2006 WL 2329939, at *5 (Aug. 9, 2006) ("The fact

that a medical opinion is from an 'acceptable medical source' is

a factor that may justify giving that opinion greater weight

than an opinion from a medical source who is not an 'acceptable

medical source' because . . . 'acceptable medical sources' 'are

the most qualified health care professionals.'"  (citation

omitted)).[8]  Barup's argument here does not show error.

---

[7] Barup further argues that the ALJ gave inadequate reasons for changing the weight he assigned to OT Gatchell's opinions from the initial decision to the decision after remand from the Appeals Council.  Substantial evidence did not support the change of weight, Barup contends, particularly given the favorable evidence that entered the record in the interim.  See Doc. No. 10-1 at 11.  This argument, unsupported by record or case citations, is not adequately developed.  See United States v. Sevilla-Oyola, 770 F.3d 1, 14 (1st Cir. 2014).

[8] Barup relies on a similar argument to contest the ALJ's treatment of OT Van Saun's opinion, claiming that the ALJ erred in discounting OT Van Saun for being neither an acceptable medical source nor a treating source, and for lacking expertise in Barup's conditions.  See Doc. No. 10-1 at 13.  An ALJ may consider whether a source is an acceptable medical or a treating source, however.  See SSR 06-03P, 2006 WL 2329939, at *4-5.  And even if the ALJ erred in considering OT Van Saun's lack of

### d.   Ms. Daugherty

In letters dated January and February 2013, Barup's sister-in-law Joyse Daugherty described Barup's overall decline in health and specific instances of limited ability she observed while staying with Barup and her husband for a short time.  The ALJ assigned the letters little weight because Ms. Daugherty was not a medical source, only observed Barup for a brief time, and the letters clashed with other evidence in the record.

Barup contends that the ALJ did not give the required degree of consideration to Ms. Daugherty's opinions, which were consistent with other evidence in the record.  I find no error. The ALJ considered Ms. Daugherty's opinion and gave at least two supportable reasons – she was a non-medical source who spent a brief time with Barup – for discounting it.  See SSR 06-03P, 2006 WL 2329939, at *5-6.  That is sufficient.

### e.   Testimony of Christopher Blackler

Barup last argues that the ALJ erred by failing to explain the weight he gave to the testimony of Barup's husband, Christopher Blackler.  See Doc. No. 10-1 at 16.  The ALJ noted in his RFC analysis that Mr. Blackler had testified to, inter alia, Barup's headaches and her difficulties dressing, tying her

---

expertise, he cited two valid reasons for discounting her opinion and at least two other reasons that Barup does not contest.  Tr. at 34-35.

shoes, and walking.  Tr. at 29.  Barup is correct that the ALJ did not explain the weight he attached to Mr. Blackler's testimony.  Still, an ALJ is not strictly required to explain the weight given to a non-medical source, even non-medical sources that see a claimant in their professional capacity.  See SSR 06-03P, 2006 WL 2329939, at *6.  As the ALJ clearly considered Mr. Blackler's testimony, Mr. Blackler did not see Barup in a professional capacity, and Mr. Blackler's testimony was largely cumulative, I find no error.[9]

## B.   Evaluation of Non-Severe Impairments

At step two, the ALJ found the following non-severe impairments: right shoulder and wrist pain, headaches, fibromyalgia, and depression.

With respect to the right wrist pain in particular, at step two the ALJ discussed Barup's recent treatment with Jeffrey Clingman, M.D., for carpal tunnel syndrome.  Tr. at 21.  At a January 2015 treatment, Dr. Clingman noted that Barup had reported "full [range of motion] of the wrists and hands" and found her grip strength "quite functional."  Tr. at 1189.  He

---

[9] Barup also discusses the weight the ALJ gave to Nurse MacDonald's opinions.  After summarizing the opinions and the ALJ's explanation of his reasoning, Barup says only that "[t]he ALJ failed to properly weight MacDonald's opinion under [the applicable regulations]."  See Doc. No. 10-1 at 13-14.  Barup failed to develop an argument.  See Sevilla-Oyola, 770 F.3d at 14.

found "possible evidence of recurrent carpal tunnel syndrome."
Tr. at 1189.  After a second treatment, Barup treated with Dr.
Clingman again in April 2015.  At this third appointment, Barup
did not report an improvement in strength from the second visit,
at which she received injection treatment.  Tr. at 1272.  Dr.
Clingman stated that "provocative signs for carpal tunnel were
positive" and that Barup exhibited "mild to moderate weakness of
[right] thumb abduction."  Tr. at 1272.

During her hearing testimony, Barup indicated she planned
on undergoing carpal tunnel releases in both hands.  The ALJ
reasoned that Barup's upcoming carpal tunnel releases would
mitigate her symptoms, just as a previous release had done,
thereby making the right hand impairment non-severe.  Tr. at 21.

Barup argues that the ALJ did not properly evaluate any of
her non-severe impairments, including her right wrist pain, in
calculating her RFC.  The non-severe impairments, Barup
contends, "increased the likelihood" of Barup being absent from
work or off-task.  See Doc. No. 10-1 at 17-18.  In reaching an
RFC, the ALJ "must consider limitations and restrictions imposed
by all of an individual's impairments, even those that are not
'severe.'"  McDonough v. U.S. Soc. Sec. Admin., Acting Com'r,
2014 DNH 142, 28 (quoting Stephenson v. Halter, 2001 DNH 154, 4-
5).  The ALJ must also consider the effect of the impairments in
combination.  See McDonald v. Sec'y Health & Human Servs., 795

27

F.2d 1118, 1126 (1st Cir. 1986).

That being the case, the ALJ still has "considerable latitude" in how he or she considers non-severe impairments. Chabot v. U.S. Soc. Sec. Admin., Acting Com'r, 2014 DNH 067, 25. And discussion of a non-severe impairment throughout a decision can be sufficient to show consideration, at least where there is no evidence suggesting the contrary.  See id. at 25-27 (collecting cases).  Further, although the ALJ must consider the functional limitations effected by a non-severe impairment, he or she need not address every diagnosed impairment.  See McDonough, 2014 DNH 142, 30.

Barup first argues that the ALJ did not adequately consider her depression after step two.  See Doc. No. 10-1 at 18.  Barup points for support to the opinions of Dr. Savia and Nurse MacDonald that emotional factors exacerbated Barup's condition, and Nurse MacDonald's opinion that Barup could only perform "low stress work."  See id.

I am unpersuaded.  The ALJ discussed Barup's depression at step two, including analyzing it under the four "paragraph b" criteria.  In the RFC analysis, he explicitly discounted the opinion of Dr. Savia, and in doing so noted that Dr. Savia "suggested there might be a psychological component to" Barup's condition.  Tr. at 32.  He likewise discounted Nurse MacDonald's opinion.  Tr. at 35-36.  The decision does not recount Nurse

MacDonald's mention of emotional factors and a limitation to a low stress environment, but those opinions were made via checkboxes without direct explanation.  Tr. at 1118.  Especially where Barup did not develop arguments to contest the weight the ALJ gave to these opinions, I conclude the ALJ adequately considered Barup's depression.

Barup next argues that the ALJ failed to evaluate the impact of Barup's headaches at the RFC stage.  See Doc. No. 10-1 at 18-19.  In the course of his RFC analysis, however, the ALJ considered Mr. Blackler's testimony as to Barup's headaches. And he noted Barup's complaints to Dr. Savia, and Dr. Savia's diagnosis of chronic tension headaches.  Tr. at 32.  As mentioned above, the ALJ discounted Dr. Savia's opinion.  I see no cause for remand.[10]

Barup's penultimate argument is that the ALJ failed to properly analyze the impact of fibromyalgia, either alone or in combination with other impairments.  See Doc. No. 10-1 at 19-20. Again, I am unpersuaded.  The ALJ considered Barup's

---

[10] Barup notes that, in the ALJ's 2013 decision, he found her headaches non-severe because they failed to meet the 12-month durational requirement.  In the 2015 decision, the ALJ again found the headaches non-severe on durational grounds.  To the extent the ALJ erred in his severity analysis, the error is harmless.  See Lavoie v. Colvin, 2016 DNH 107, 6.  The issue is whether the ALJ adequately considered Barup's headaches after step two.

fibromyalgia at step two, Tr. at 22, and documented many of
Barup's complaints of pain in his RFC analysis, even if he did
not tie that pain to fibromyalgia.  More importantly, the ALJ
described Nurse MacDonald's fibromyalgia medical source
statement in his RFC analysis and explicitly discounted her
opinion.  Tr. at 35–36.  The ALJ demonstrated adequate
consideration of Barup's fibromyalgia.[11]

Finally, Barup claims that the ALJ did not consider her
upper extremity limitations in constructing the RFC.  She
focuses on the two treatments with Dr. Clingman described above.
Barup maintains it was error for the ALJ to conclude that her
upcoming releases would mitigate her symptoms, thereby making
the right hand impairment non-severe or inconsequential.  See
Doc. No. 10-1 at 20–22.

Failing to recognize an impairment as severe would be
harmless in error in this context.  See Lavoie, 2016 DNH 107, 6.
Because the ALJ demonstrated some consideration of Barup's right

_____

[11] Barup cites to Lavoie to support her arguments relating to
depression and fibromyalgia.  See Doc. No. 10-1 at 18, 20.
Lavoie does not apply.  In Lavoie, the ALJ's RFC analysis
contained only a cursory mention of the claimant's non-severe
depression, instead focusing on her fibromyalgia and other
severe impairments.  See Lavoie, 2016 DNH 107, 9 & n.2.  The ALJ
failed to consider those impairments in combination because he
did not address depression in the RFC analysis, suggesting that
the claimant's depression fell out of consideration.  See id. at
13.  In contrast, the ALJ in this case demonstrated adequate
consideration of both depression and fibromyalgia at the RFC
stage.

hand carpal tunnel syndrome, Tr. at 21, 34, and Barup has not pointed to greater evidence of functional limitations deriving from the impairment, I find no basis for remand.  Cf. McDonough, 2014 DNH 142, 30–31.


### IV.  CONCLUSION

For the foregoing reasons, I grant the Acting Commissioner's motion to affirm (Doc. No. 12) and deny Barup's motion to reverse (Doc. No. 10).  The clerk is directed to enter judgment accordingly and close the case.

SO ORDERED.


/s/Paul Barbadoro
Paul Barbadoro
United States District Judge


March 31, 2017

cc:  Janine Gawryl, Esq.
     Robert Rabuck, Esq.